# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

GERARDO E. MARTINEZ,
     Petitioner,

v.

PATRICIA A. COYNE-FAGUE,
     Respondent.

)
)
)
)
)
)
)
)
)

No. 1:21-cv-00191-JJM-PAS

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

Before the Court is Respondent Patricia A. Coyne-Fague's ("State") Motion to Dismiss (ECF No. 5) Gerardo E. Martinez's Petition for a Writ of Habeas Corpus (ECF No. 1). In his Petition, Mr. Martinez asserts that he was deprived of his right to effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. ECF No. 1 at 17.[1] The State argues that Mr. Martinez's Petition should be dismissed because he cannot meet his burden to show that the state court's decision was "contrary to, or involved an unreasonable application of clearly established Federal law." ECF No. 5 at 3, 6 (citing 28 U.S.C. § 2254 (d)(1)).

## I.   BACKGROUND

In 2007, a jury convicted Mr. Martinez of the first-degree murder of his girlfriend, Lindsay Burke, and driving a motor vehicle without consent of the owner.

---

[1] Page numbers reflect the pagination generated by the Court's Electronic Filing System ("ECF").

ECF No. 5-3 at 1.[2] The jury further found that the murder had been committed with both aggravated battery and torture of the victim. *Id.* at 2.[3] Mr. Martinez moved for a new trial, which the court denied. ECF No. 1-2 ¶ 10. After a hearing during which Mr. Martinez's attorney ("trial counsel") presented mitigation evidence from Ronald M. Stewart, M.D., the trial justice sentenced Mr. Martinez to life imprisonment without the possibility of parole. ECF No. 5-3 at 2. The Rhode Island Supreme Court ("RISC") affirmed the conviction and sentence. *State v. Martinez*, 59 A.3d 73, 95 (R.I. 2013).[4] Mr. Martinez did not seek further review. ECF No. 1 at 3.

Mr. Martinez then applied for post-conviction relief in the trial court, alleging ineffective assistance of trial counsel. ECF No. 5-3 at 1; *see also* ECF No. 1-2 at 7. After hearing, the Rhode Island Superior Court denied his application. ECF No. 5-3 at 29. Mr. Martinez filed a petition for certiorari to review the post-conviction court's denial of relief, which the RISC denied in a brief order. ECF No. 6-4.

Mr. Martinez timely filed this habeas Petition under 28 U.S.C. § 2254(d)(1). ECF No. 1.[5] The State now moves to dismiss the Petition, arguing that Mr. Martinez has failed to state a claim upon which he would be entitled to relief. ECF No. 5 at 3.

---

[2] Exhibit 3 to the State's Motion to Dismiss is the state post-conviction court's decision, which can also be found at Appendix I (ECF No. 1-2), which is appended to the Petition, and at *Martinez v. State*, Case No. KM-2013-0095, 2018 WL 1359478 (R.I. Super. Ct. Mar. 7, 2018).

[3] For a complete description of the facts relating to the murder, *see Martinez*, 59 A.3d at 77-83.

[4] A copy of the R.I. Supreme Court's opinion is also included in the parties' filings at ECF No. 1-2, App. C, and ECF No. 5-2.

[5] Mr. Martinez has "satisfied all of the preliminary criteria" in petitioning for habeas corpus review; he timely moved; he fairly presented his constitutional claim of ineffective assistance of counsel; he fully exhausted all state remedies; and the

## II.   STANDARD OF REVIEW

*Habeas Standard*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits this Court's review of state convictions and sentences. *Carpio v. Wall*, 269 F. Supp. 3d 4, 6 (D.R.I. 2017).   Thus, habeas corpus relief serves as a "'guard against extreme malfunctions in the state criminal justice systems' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011).

When a state court has adjudicated a claim on the merits, a federal court may grant habeas corpus relief only if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   "[A]n *unreasonable* application of federal law is distinguished from an *incorrect* application of federal law." *Carpio*, 269 F. Supp. 3d at 9 (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)) (alteration in original).   An incorrect application is "contrary to clearly established law if the state court applies a rule that contradicts the governing law set forth by the Supreme Court or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court]

---

RISC's decision was based on clearly established federal law in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), not on independent state law grounds. *See* ECF No. 9-1 at 1.

and nevertheless arrives at a result different from [its] precedent." *Hensley v. Roden*, 755 F.3d 724, 731 (1st Cir. 2014) (alterations in original) (internal quotation marks omitted).  An unreasonable application occurs "if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the [U.S. Supreme] Court." *DeCiantis v. Wall*, 868 F. Supp. 2d 1, 5 (D.R.I. 2012) (alterations in original), *aff'd*, 722 F.3d 41 (1st Cir. 2013); *see also Norton v. Spencer*, 351 F.3d 1, 8 (1st Cir. 2003) ("If it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." (quoting *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002))).  "The upshot of the AEDPA habeas regime is that 'when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.'" *Porter v. Coyne-Fague*, 35 F.4th 68, 75 (1st Cir. 2022) (quoting *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)).[6]  "'[E]valuating whether a rule application was unreasonable requires

---

[6] Here, the last state court to decide Mr. Martinez's post-conviction application and "explain[] its decision on the merits in a reasoned opinion . . . ," *Porter*, 35 F.4th at 75, is the Rhode Island Superior Court, given the fact that the R.I. Supreme Court's order affirming the denial of relief did not address the merits of the claims, *see* ECF No. 6-4.

considering the rule's specificity,' such that '[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" *Porter*, 35 F.4th at 75 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (second alteration in original). However, "[t]he Supreme Court has recognized that even a general standard may be applied in an unreasonable manner." *Bebo v. Medeiros*, 906 F.3d 129, 134 (1st Cir. 2018) (internal quotation marks omitted).

> The second scenario justifying habeas relief is if the state court adjudication led to "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Though this means that a federal court will be taking a closer look at a state court's findings of fact, the fundamental principle of deference to those findings still applies.

*Hensley*, 755 F.3d at 731. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceedings, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).[7] "This demanding

---

[7] In *Miller-El*, the Supreme Court clarified that:

AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence. The clear and convincing standard is found in § 2254(e)(1), but that subsection pertains only to state-court determination of factual issues, rather than decisions. Subsection (d)(2) contains the unreasonable requirement and applies to the granting of habeas relief . . . .

537 U.S. at 341-42.

showing cannot be made when '[r]easonable minds reviewing the record might disagree' about the finding in question." *Porter*, 35 F.4th at 75 (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)). "That said, '[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Porter*, 35 F.4th at 75 (quoting *Brumfield*, 576 U.S. at 314 (alteration in original).

*Ineffective Assistance of Counsel Standard*

The standard for analyzing a claim of ineffective assistance of counsel stems from *Strickland v. Washington*, 466 U.S. 668 (1984), which provides a two-pronged test for evaluating such claims. *Kholi v. Wall*, CA No. 14-307-JJM-LDA, 2015 WL 567148 at *4 (D.R.I. Feb. 10, 2015). Under the "performance prong" of the *Strickland* test, Mr. Martinez must show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Under the "prejudice prong," Mr. Martinez must show that "the deficient performance prejudiced the defense." *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

When evaluating ineffective assistance of counsel claims, the RISC employs a standard "identical to the one set forth by the Supreme Court of the United States in *Strickland v. Washington*." *Tassone v. State*, 42 A.3d 1277, 1284 (R.I. 2012) (internal citation omitted); *see also Brown v. Moran*, 534 A.2d 180, 182 (R.I. 1987)

(summarizing *Strickland* standard); ECF No. 5-3 at 18 (citing *Brown*, 534 A.2d at 182).

## III. DISCUSSION

In the state post-conviction proceeding, Mr. Martinez raised the same claims he presents in this Court: That he received ineffective assistance of counsel because trial counsel 1) failed to obtain qualified experts to testify for the defense at trial, 2) failed to pursue a diminished-capacity defense, and 3) failed to present a defense for the jury to consider. ECF No. 5-3 at 3; ECF No. 1-2, App. F at 8, 13.[8] As the post-

---

[8] In his original pro se application for state post-conviction relief, Mr. Martinez presented six claims of attorney error. ECF No. 1-2 at 101-03; ECF No. 5-3 at 3. The post-conviction court appointed counsel, but two attorneys withdrew from representing Mr. Martinez. ECF No. 5-3 at 4. A third also moved to withdraw, after finding the issues raised by Mr. Martinez "to be wholly frivolous, without merit, and neither supported by existing law, nor by a good faith argument for the extension, modification, or reversal of existing law." *Id.* The attorney filed an extensive memorandum pursuant to *Shatney v. State*, 755 A.2d 130 (R.I. 2000), detailing his efforts and reasoning, ECF No. 5-3 at 5-6. The state court ultimately granted the attorney's motion to withdraw, appointed a fourth attorney, William v. Devine, Jr., Esq. ("post-conviction counsel"), to represent Mr. Martinez, and held an evidentiary hearing on Mr. Martinez's claims. *Id.* at 6-8; *see also id.* n.7. Post-conviction counsel filed a memorandum in support of Mr. Martinez's application, *see id.* at 3, narrowing the issues to the above-mentioned three claims, ECF No. 5-3 at 3-4.

Regarding the second issue, in state court Mr. Martinez argued that trial counsel failed to present a diminished capacity defense, as promised to Mr. Martinez and his family. ECF No. 1-2 at 8. The post-conviction court found:

> With regard to alleged promises as to trial strategy made by trial counsel to the Petitioner and his family, there is no meaningful discussion or legal briefing thereof, and the record of the evidentiary hearing in this matter includes no reference to this issue in either the State's direct examination of [trial counsel] or in the Petitioner's cross-examination of [him].

conviction hearing justice stated, "[c]entral to these overlapping claims is one issue: Whether trial counsel was ineffective by deciding to forego a defense of diminished capacity." ECF No. 5-3 at 4; *see also id.* ("The gravamen of Petitioner's argument is that his trial counsel should have presented such a defense because it would have negated the requisite intent for first-degree murder. [Trial counsel's] decision not to do so, according to Petitioner, resulted in Petitioner's first-degree murder conviction."); ECF No. 11 at 4 ("It was undisputed that Mr. Martinez's actions . . . caused Lindsay Burke's death. The only issue was Mr. Martinez's state of mind at the time of the offense: Whether there was more than a mere momentary intent to kill (premeditation) (first-degree murder), a mere momentary intent to kill (second-degree murder), or an inability to form the specific intent to kill because of intoxication, trauma, or mental disease (voluntary manslaughter).").

The post-conviction court found that Mr. Martinez had failed to prove that he received ineffective assistance of counsel. ECF No. 5-3 at 25; *see also id.* at 27 ("The Court cannot conclude that [trial counsel's] performance 'was deficient in that it fell below an objective standard of reasonableness . . . .'" (quoting *Tassone v. State*, 42 A.3d 1277, 1284 (R.I. 2012))) (alteration in original). Thus, the question this Court must answer is this: "Was the [R.I. Superior] Court's decision . . . so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement?" *White v. Wheeler*, 577 U.S.

---

ECF No. 5-3 at 3 n.2. Accordingly, the court did not discuss the alleged promise further. *See generally* ECF No. 5-3. Mr. Martinez does not raise that part of the issue here.

73, 78-79 (2015) (internal quotation marks omitted); *see also Harrington*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (internal quotation marks omitted).

As stated above, in deciding Mr. Martinez's habeas Petition, the role of this Court is limited to deciding whether the State's application of the *Strickland* standard was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). This is not the same question as deciding whether counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard."); *see also id.* at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."); *Field v. Hallett*, 37 F.4th 8, 17 (1st Cir. 2022) (noting federal courts' "limited leeway under AEDPA, and even less when it comes to ineffective assistance claims" in state habeas cases); *Civitarese v. Goguen*, 410 F. Supp. 3d 303, 318 (D. Mass. 2019 ("The *Strickland* standard is a general one, so the range of reasonable applications is substantial.

Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).").

"The Supreme Court has found an ineffective assistance of counsel claim to be a mixed question of law and fact and is thus to be evaluated under the unreasonable application clause of 28 U.S.C. § 2254." *Field*, 37 F.4th at 16 n.1 (citing *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 70 (1st Cir. 2009)); *see also Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) ("Since an ineffective assistance of counsel claim is a mixed question of law and fact, Teti cannot be granted relief unless the [Massachusetts Appeals Court's] decision was an 'unreasonable application of[] clearly established federal law.'" (quoting *Williams*, 529 U.S. at 411)) (second alteration in original) (internal citations omitted).[9]

First, the facts, as summarized by the post-conviction court. The state Superior Court held an evidentiary hearing on Mr. Martinez's post-conviction application. *See* n.8; *see also* ECF No. 5-3; ECF No. 12-1. The court heard testimony from trial counsel, ECF No. 12-1 at 1220-92; Helen Sheehan, Mr. Martinez's psychotherapist, *id.* at 1292-1302; and John Parsons, Ph.D., who performed a forensic psychological evaluation of Mr. Martinez at post-conviction counsel's request, *id.* at 1303-1407.

---

[9] In any event, Mr. Martinez does not appear to dispute that the post-conviction court correctly applied clearly established federal law as determined by the Supreme Court, here *Strickland*. *See* ECF No. 11 at 16 ("The state court applied clearly established federal law, *Strickland v. Washington*, when evaluating Mr. Martinez's ineffective assistance of counsel claim.").

After summarizing trial counsel's lengthy experience handling and trying criminal cases in Rhode Island, including trying approximately forty murder cases, the post-court stated: "In each case, he was called upon to make strategic decisions about the best possible defense. In this case, grasping the 'extremely difficult' nature of the facts, [trial counsel's] decision-making was influenced accordingly." ECF No. 5-3 at 8. Trial counsel reviewed everything he received in discovery from the State. *Id.* This included a "large group of photographs which showed the result of that fateful day." *Id.* at 9. Trial counsel testified that "[w]ithout question the pictures factored into the decisions he made going forward regarding how to best defend Petitioner." *Id.* (alteration in original). "The graphic photographs told the whole story." *Id.* In addition, the testimony of criminologist Walter Williams aided trial counsel in his assessment. *Id.* at 9 n.8.

The altercation between Mr. Martinez and Ms. Burke began in the living room, where Mr. Martinez punched the victim in the nose, as evidenced by the blood droplets on the couch and in a circular pattern on the floor. *Id.* at 9. Ms. Burke then moved to the bathroom, where she left bloody tissues in the wastebasket. *Id.* It was apparent that she suffered the fatal blow while sitting on the toilet, based on the "huge massive hemorrhage" on the floor and transfer stain on the toilet. *Id.* In addition, the blood in front of the toilet and two arcs of blood on the wall indicated that Ms. Burke had moved after her jugular vein was severed. *Id.* The picture of her "new love interest," which had been in her pocketbook in the living room, was found in the bathroom sink, "showing that Petitioner had been in a fit of rage and jealousy."

*Id.* After the killing, Mr. Martinez put Ms. Burke in the bathtub and covered her with a blanket and stuffed animal. *Id.*

Trial counsel analyzed the above information and tried to determine how to "soften" the impact of the photographs on the jury. *Id.* He testified that he believed the whole case would be over as soon as the pictures were shown. *Id.* Therefore, he had to come up with an approach for the jury to understand how the brutal killing took place. *Id.* In trial counsel's opinion, a defense that Mr. Martinez suffered from post-traumatic stress disorder ("PTSD") would "not go over well with the jury." *Id.* In addition, Mr. Martinez had recorded a video confession after the murder, in which he appeared calm, cool, and collected while apologizing for killing Ms. Burke and making excuses for doing so. *Id.* at 9-10. After recording the confession, Mr. Martinez went to the bank and withdrew money. *Id.* at 10.

Trial counsel sought another way to convince the jury that the killing was second-degree murder, not first-degree murder. *Id.* There was no question as to who killed Ms. Burke, given Mr. Martinez's videotaped confession. *Id.* Trial counsel determined that the best defense to accomplish his only goal, obtaining a second-degree murder conviction, was to demonstrate that the murder was a crime of passion and not premeditated. *Id.* Trial counsel would attempt to show that Mr. Martinez was a "very jealous" man, that Ms. Burke was "foolish enough" to keep a photo of the new object of her affection in her purse, and that Mr. Martinez "snapped" when he found the picture. *Id.* Both the video and a purported suicide note Mr. Martinez wrote before attempting suicide contained language that could help trial counsel

make this argument: Mr. Martinez "snapped" when he discovered that Ms. Burke had lied to and cheated on him, and he could not deal with having been "f***ed over" yet again." *Id.* (alteration in original).

In addition to believing a crime of passion argument to be the best way to convince the jury that second-degree murder was appropriate, trial counsel was also extremely concerned that a diminished-capacity defense would present significant risk to Mr. Martinez if presented to the jury. *Id.* However, the post-conviction court stated, trial counsel did consider such a defense. When he first met with Mr. Martinez, trial counsel instructed Mr. Martinez to sign a medical release form and, subsequently, sent requests for records to three of his medical providers. *Id.* at 10-11. Although trial counsel had not yet formulated a defense strategy, he knew the records were important. *Id.* at 11. He considered employing an expert witness, but first needed to discuss with a psychiatrist whether a defense of diminished capacity would be viable. *Id.* Accordingly, he hired Dr. Stewart. *Id.* They discussed whether it would be worthwhile to utilize a forensic psychiatrist in Mr. Martinez's defense. *Id.* Trial counsel testified that he believed he received a pretrial report from Dr. Stewart; in fact, he received two reports, one addressing guilt and one addressing mitigation, after the trial had ended. *Id.*[10] However, trial counsel met with Dr. Stewart in person and discussed what trial counsel was trying to do, and he provided Dr. Stewart with Mr. Martinez's medical records. *Id.* Trial counsel testified that he and Dr. Stewart

---

[10] Only the second report was submitted to the state court. ECF No. 11 at 5 n.5; *see also* ECF No. 1-2, App. L.

"definitely" had "significant" conversations before trial, which factored into trial counsel's decision not to use Dr. Stewart in the defense-in-chief. *Id.*

Trial counsel's concern regarding using Dr. Stewart during the guilt phase of the trial stemmed from his fear that doing so would open the door to evidence from the State regarding Mr. Martinez's prior abuse of Ms. Burke being admissible, as well as his abusive relationships with his ex-wife and ex-girlfriend. *Id.* at 12. As trial counsel explained, if Dr. Stewart's opinion were based on X history, the prosecution could cross-examine him as to whether his opinion would change if he knew about facts Y and Z. *Id.* Even if Dr. Stewart answered in the negative, the jury would hear the evidence regarding Mr. Martinez's abuse of the three women. *Id.* Trial counsel testified that he "would be a fool" to allow such evidence to come in that way, as it would be "suicide" for Mr. Martinez's case. *Id.*

Accordingly, about four to six weeks before Mr. Martinez's trial commenced, trial counsel decided not to use an expert psychiatrist or present a diminished-capacity defense at trial. *Id.* Rather, he would use Dr. Stewart's opinion for mitigation at sentencing. *Id.* Trial counsel was mainly influenced by the basic evidence against Mr. Martinez; however, he also consulted with a highly respected defense attorney in Rhode Island, Robert Mann, Esq. *Id.* Mr. Mann opined that the evidence of Mr. Martinez's prior domestic abuse was such that impeachment of the expert psychiatrist could be devastating. *Id.* Therefore, he suggested that trial counsel use evidence of Mr. Martinez's mental health diagnoses during the sentencing phase. *Id.* at 12-13.

Pretrial, trial counsel had tried to exclude evidence of Mr. Martinez's history of domestic violence, but some of that evidence was nonetheless admitted at trial. *Id.* at 13. Still, trial counsel stated that, even in hindsight, he would not have changed his decision not to have Dr. Stewart testify at trial because then the evidence would have been presented to the jury twice, reinforcing Mr. Martinez's prior bad acts. *Id.* Further, if the jury had heard—and rejected—the psychiatric evidence and convicted Mr. Martinez of first-degree murder, the trial justice would have been less likely to weigh it favorably at sentencing. *Id.* Trial counsel felt that the psychiatric evidence would have a greater mitigating effect if the trial justice heard it for the first time at sentencing. *Id.* Thus, although Dr. Stewart prepared a report including his expert opinion that Mr. Martinez could not have formed the requisite intent to be found guilty of first-degree murder, trial counsel made a strategic decision before trial not to use that testimony during the guilt phase. *Id.* at 13-14.

Trial counsel's only strategic objective was to obtain a second-degree murder conviction, and he determined that the best way to accomplish this goal was to use a "crime of passion" defense. *Id.* at 14. Using medical evidence to attempt to negate intent would not have benefited this strategy in trial counsel's closing argument. *Id.* His strategy was based on Mr. Martinez's nature as well as the on-and-off nature of his relationship with the victim. *Id.* The problem with that strategy, in trial counsel's view, was that the altercation began in the living room before fatally culminating in the bathroom—it was "more than a mere moment." *Id.* Trial counsel thought that his crime of passion argument would be discredited, and the jury confused, if he then

told the jury that medical evidence showed that Mr. Martinez was mentally ill at the time of the murder. *Id.* He felt it was necessary to choose a strategy and pursue it, which he did. *Id.*

Mr. Martinez's post-conviction counsel next presented Ms. Sheehan's testimony. *Id.* Ms. Sheehan was Mr. Martinez's psychotherapist from April 4, 2004, through September 12, 2005. *Id.* The general theme of their sessions was Mr. Martinez's depression, but he also discussed his anger toward others. *Id.* at 14-15. His biggest concerns were his separation from his children and his troubles with the court system. *Id.* at 15. Initially, he described his issues as anxiety and panic attacks, suffering losses, not seeing his children often enough, and enduring abuse while growing up. *Id.* Ms. Sheehan testified that he seemed mostly sad and helpless. *Id.* She treated him using cognitive behavior therapy ("CBT"). *Id.*

At his next-to-last therapy session, Mr. Martinez presented as feeling helpless and angry. *Id.* He related that he had gotten into an argument with Ms. Burke because she was late, and, in response, he threw her clothes and knocked her jewelry off the bureau. *Id.* Two weeks later, the day before the murder, Mr. Martinez told Ms. Sheehan that he was experiencing anger and embarrassment from being called a liar. *Id.* Ms. Sheehan noted that Mr. Martinez's Global Assessment of Functioning ("GAF") score indicated that he was "functioning pretty well" that day. *Id.*

Lastly, the post-conviction court heard testimony from Dr. Parsons, who was qualified as an expert in psychology. *Id.* He performed a forensic evaluation of Mr. Martinez, seeing him five times at the Adult Correctional Institutions ("ACI")

between October 17, 2016, and February 4, 2017. *Id.*[11] Each visit lasted from two to

three and a half hours. *Id.*    Dr. Parsons first spoke with post-conviction counsel to

ascertain Mr. Martinez's presenting problem (that he was incarcerated at the ACI

and wanted post-conviction relief). *Id.* at 16.    Next, Dr. Parsons met with Mr.

Martinez to learn as much about him as possible. *Id.*  In his interviews with Mr.

Martinez, Mr. Martinez recounted his history and his recollection of the crime. *Id.*

Dr. Parsons also conducted general psychological testing. *Id.*  He then began working

through the records to determine whether Mr. Martinez's statements matched his

history. *Id.* In addition to his interviews with Mr. Martinez and review of the medical

records, Dr. Parsons reviewed voluminous documentation of the crime and its

immediate aftermath. *Id.*[12]

In drafting his report, Dr. Parsons had access to Mr. Martinez's records from

two previous treatment providers. *Id.*  Ms. Sheehan's records indicated that Mr.

Martinez was prescribed psychotropic medications. *Id.*  Dr. Parsons also reviewed

her psychotherapy notes, which revealed that she was treating Mr. Martinez with

CBT, traditionally used with trauma victims. *Id.* at 16-17. According to Dr. Parsons,

the issue with CBT is that it requires the patients to relive their traumatic

---

[11] Dr. Parsons explained that a forensic evaluation entailed reviewing Mr. Martinez's medical records and obtaining as much collateral information as possible before reaching a conclusion. ECF No. 5-3 at 15.

[12] The post-conviction justice noted that Dr. Parsons did not view the two videos of Mr. Martinez's confession and interview with the police, before completing his report, although he had access to transcripts of those videos beforehand. ECF No. 5-3 at 16 n.11. Dr. Parsons was able to view the videos prior to the hearing. *Id.* However, the post-conviction justice stated, "the videos did not change Dr. Parsons' initial diagnostic opinion; in fact, they further solidified it." *Id.*

experiences, which can trigger panic attacks (which Mr. Martinez told Dr. Parsons had happened). *Id.* at 17.

Dr. Parsons also reviewed Dr. Stewart's report addressing Mr. Martinez's apparent incapacity to form intent at the time of the murder. *Id.* Dr. Parsons felt it was important to have access to a previous forensic evaluation. *Id.* Dr. Stewart had discussed Mr. Martinez's psychotropic medications and brain damage from multiple head traumas. *Id.* Dr. Parsons "[f]or the most part" agreed with Dr. Stewart's assessment. *Id.* (alteration in original). Where they differed was in their diagnoses of Mr. Martinez. *Id.* Dr. Stewart had diagnosed him with PTSD. *Id.* Dr. Parsons, however, further concluded that Mr. Martinez's PTSD was marked by dissociative symptoms, which manifested themselves in the flashbacks Mr. Martinez experienced. *Id.* According to Dr. Parsons, Mr. Martinez's dissociation was more pronounced because of the severity of the traumas he endured over many years. *Id.* In Dr. Parsons' expert opinion, Mr. Martinez's PTSD with dissociative symptoms so impaired him that he lacked the intent to murder Ms. Burke. *Id.* Dr. Parsons testified to a reasonable degree of psychological certainty that, given the severity of Mr. Martinez's illness, the volume and frequency of traumatic events he had endured, as well as the combination of his over-consuming psychotropic medications and lack of sleep on the day of the murder, when Mr. Martinez saw pictures of Ms. Burke's new love interest he experienced a flashback to the prior losses in his life and dissociated. *Id.*

The state post-conviction court framed the issue as "whether it was objectively unreasonable for [trial counsel] to employ Dr. Stewart's testimony as mitigation during the sentencing phase of the trial instead of during the guilt phase of the trial in an attempt to disprove the specific intent necessary to commit first-degree murder." *Id.* at 21. The court found that it was not. *See id.* at 25 (finding trial counsel's tactical decision in this regard was reasonable "in view of the totality of the circumstances").

Mr. Martinez argues that the no-premeditation defense trial counsel pursued was both factually and legally invalid. ECF No. 11 at 22. He contends that the state court's adjudication of his ineffective assistance of counsel claim resulted in a decision that was both an unreasonable application of clearly established federal law and also based on an unreasonable determination of the facts in light of the evidence presented at the state post-conviction hearing. *Id.* at 17. Specifically,

> The state court decision denying Mr. Martinez relief was unreasonable. The only viable defense here was diminished capacity, which trial counsel failed to present. Instead, trial counsel presented a defense of no-premeditation that was legally and factually invalid. This was constitutionally deficient. The state court decision, finding otherwise, was unreasonable.

> Further, trial counsel's post-hoc explanation for not presenting a diminished capacity defense is of no moment. The bottom line is that pursuing an invalid defense instead of a viable one is not an objectively reasonable strategy. It was unreasonable for the state court to rely on trial counsel's explanations to deny Mr. Martinez relief.

> Finally, trial counsel's constitutionally ineffective performance prejudiced Mr. Martinez. Had a diminished capacity defense been presented there is a reasonable probability that the result of the state court trial would have been different. There is a reasonable probability that Mr. Martinez would not be serving a sentence of life-without-parole.

*Id.*[13]

Under Rhode Island law, "[t]he unlawful killing of a human being with malice aforethought is murder." R.I. Gen. Laws § 11-23-1. The statute goes on to list a number of ways by which first-degree may be committed. *See id.* "Any other murder is murder in the second degree." *Id.*; *see also State v. Gillespie*, 960 A.2d 969, 975-77 (R.I. 2008) (discussing first- and second-degree murder under Rhode Island law).

> Because § 11-23-1 defines first-degree murder as a "willful, deliberate, malicious, and premeditated killing," and second degree murder as "[a]ny other murder," it necessarily follows that second-degree murder does not encompass "willful, deliberate, malicious, and premeditated" killings. Rather, the only requirement for a killing to qualify as second-degree murder is that it be committed with malice aforethought.

*Gillespie*, 960 A.2d at 975 (quoting § 11-23-1); *see also State v. Texieira*, 944 A.2d 132, 142 (R.I. 2008) ("In other words, murder in the second-degree 'is any killing of a human being committed with malice aforethought that is not defined by statute as

_____

[13] Pursuant to § 11-23-2 of the Rhode Island General Laws:

> Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: . . . (4) committed in a manner involving torture or an aggravated battery to the victim ... shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment. . . .

R.I. Gen. Laws § 11-23-2; *see also State v. Texieira*, 944 A.2d 132, 143-44 (R.I. 2008) (noting mandatory statutory language regarding life imprisonment sentence for first-degree murder). In Mr. Martinez's case, the jury found that both torture and aggravated battery to the victim were present, and the trial justice sentenced Mr. Martinez to life imprisonment without the possibility of parole. ECF No. 5-3 at 2; *see also State v. Motyka*, 893 A.2d 267, 288 (R.I. 2006) ("According to G.L. 1956 § 11-23-2, a sentence of life imprisonment without the possibility of parole may be imposed in a first-degree murder case when one of seven enumerated grounds is present.").

first-degree murder.'" (quoting *State v. Parkhurst*, 706 A.2d 412, 421 (R.I. 1998))).
The RISC "has defined malice aforethought as being synonymous with malice, either
express or implied." *Texieira*, 944 A.2d at 142. "Legal malice can arise from either
an express intent to kill or to inflict great bodily harm or from a hardness of the heart,
cruelty, wickedness of disposition, recklessness of consequence, and a mind
dispassionate of duty." *Id.* (quoting *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I.
1980)); *see also id.* ("Malice aforethought consists of an unjustified disregard for the
possibility of death or great bodily harm and an extreme indifference to the sanctity
of human life.") (internal quotation marks omitted).   Premeditation "is not a
requirement of malice aforethought and thus is not an element of second degree
murder." *Gillespie*, 960 A.2d at 976.

The RISC has held that "the distinction between first-degree and momentary-
intent-based second-degree murder is the *duration* of the defendant's intent to kill."
*Id.* at 976-77. "First degree murder requires that the defendant harbored a more-
than-momentary intent to kill prior to committing the homicide—in essence that they
acted with premeditation.  In contrast, the momentary-intent theory of second-degree
murder involves a fleeting intent that is contemporaneous with the murder." *Id.*
at 977 (internal citations omitted).

"Voluntary manslaughter, on the other hand, is the product of a deliberate act
that does not include the element of malice aforethought by reason of one or more
mitigating factors." *State v. Hockenhull*, 525 A.2d 926, 929 (R.I. 1987).

> Such mitigating factors may exist when the crime is committed in
> the heat of passion arising as a result of adequate provocation.

> Voluntary manslaughter may also result from a deliberate act of homicide wherein the accused is suffering from sufficiently diminished capacity that renders him unable to form the specific intent necessary to constitute murder.

*Id.* at 929-30 (internal citations omitted; *see also State v. Ruffner*, 911 A.2d 680, 687 (R.I. 2006) ("[H]eat of passion exists when the defendant suddenly and temporarily loses his self-control as a result of experiencing some overpowering emotion—such as extreme fear, terror, or anger—caused by a legally adequate provocation . . . .'") (second alteration in original) (internal quotation marks omitted).

> The diminished capacity doctrine recognizes that although an accused was not suffering from a mental disease or defect when the offense was committed sufficient to exonerate him totally of all criminal responsibility, his mental capacity may have been so diminished by intoxication, trauma, or mental disease that he did not possess the specific mental state or intent essential to the particular offense charged.

*State v. Doyon*, 416 A.2d 130, 134 (R.I. 1980).

Against this statutory backdrop, the Court turns to the state court's evaluation of Mr. Martinez's claims.

In reviewing trial counsel's performance, the Rhode Island Superior Court held an evidentiary hearing; the post-conviction court also thoroughly reviewed the trial transcript. ECF No. 5-3 at 22 n.12. The state court properly viewed trial counsel's performance through the lens of "counsel's perspective at the time." *Id.* at 24. With this perspective in mind, the court evaluated trial conviction counsel's strategic decision not to present a diminished-capacity defense, *id.* at 24-27, and stated:

> Even assuming that Petitioner is correct that a diminished-capacity defense would have successfully negated the requisite intent for first-degree murder, he has failed to prove ineffective assistance of counsel.

> Certainly, effective representation does not equate to successful representation. [Trial counsel] chose and vigorously pursued a particular trial strategy—the one that he thought gave his client the best chance of success. The Court does not view his strategic decision as an erroneous one, but even if it was, mere tactical decisions do not amount to ineffective assistance of counsel.

*Id.* at 25 (internal citations and quotation marks omitted); *see also id.* ("[A] court must distinguish between tactical errors made as a result of ignorance and neglect and those arising from careful and professional deliberation. Thus, a choice between trial tactics, which appears unwise only in hindsight, does not constitute constitutionally-deficient representation under the reasonably competent assistance standard.") (alteration in original) (internal citations and quotation marks omitted).

Applying the *Strickland* two-part test, and "look[ing] at the entire performance of counsel," *id.* at 27 (quoting *Tassone*, 42 A.3d at 1286 (alteration in original), the post-conviction court found that Mr. Martinez had not met his burden of showing that trial counsel's performance "was deficient in that it fell below an objective standard of reasonableness . . . ," *id.* (quoting *Tassone*, 42 A.3d at 1286) (alteration in original)). The state court was satisfied that trial counsel's "trial performance certainly fell within the wide range of reasonable professional assistance to which Petitioner was entitled." *Id.* Because Mr. Martinez did not show his trial counsel's performance was "ineffective" under the first *Strickland* prong, the court declined to analyze the second "prejudice" prong of *Strickland. See id.* at 28.

Mr. Martinez contends that the issue is not whether trial counsel made a strategic choice with respect to Dr. Stewart's testimony, but, rather, that "pursuing an invalid defense instead of a viable one is not an objectively reasonable strategy."

ECF No. 11 at 17; *see also id.* at 28 ("The relevant question is not whether counsel's choices were strategic, but whether they are reasonable." (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000))). In fact, the relevant question for this Court is whether the state court's finding that Mr. Martinez received reasonably professional assistance was itself reasonable. *See Harrington*, 562 U.S. at 101; *Carpio*, 269 F. Supp. 3d at 9 ("[I]t is not for this Court to decide whether Mr. Carpio meets the *Strickland* standard. In deciding Mr. Carpio's habeas petition, this Court instead decides 'whether the state court's application of the *Strickland* standard was unreasonable.'" (quoting *Harrington*, 562 U.S. at 101)). Mr. Martinez maintains that the finding was not reasonable. ECF No 11 at 28.

Mr. Martinez points to a Second Circuit case, *Rivas v. Fischer*, 780 F.3d 529 (2d Cir. 2015), in support of his argument. ECF No. 11 at 21-22. According to Mr. Martinez, in *Rivas*, as in his case,

> trial counsel failed to pursue a viable strategy (attacking the medical examiner's findings) and instead relied on an unsound alibi defense. The Second Circuit granted habeas relief, holding that the state court unreasonably applied *Strickland* because no fairminded jurist could agree that the "quantum of evidence known to [trial counsel] at the time justified his decision to forgo further investigation" into the medical examiner's findings and instead rely on a critically deficient alibi. "The alibi defense amounted to no defense at all," and it was not sound trial strategy to pursue it. Although Mr. Rivas had an alibi for most of Saturday, the medical examiner's time of death was Friday. The state never argued the time of death was Saturday or Sunday. But the medical examiner's findings were suspect. The medical examiner altered the time of death, six years later, after a new district attorney re-opened the case, which had gone cold. Had trial counsel pursued a strategy attacking the medical findings, the state's case would have crumbled. On state post-conviction relief, Mr. Rivas presented a forensic pathologist who testified that to a reasonable degree of medical certainty, the time of death was not Friday.

ECF No. 11 at 21-22 (alteration in original) (internal citations omitted).   Mr. Martinez argues that here,

> given what trial counsel knew about Mr. Martinez's mental health and the overwhelming evidence of premeditation, the only defense was diminished capacity.  It was not sound strategy for trial counsel to forego this defense and pursue a no-premeditation defense, which, like the incomplete alibi in *Rivas*, was critically deficient and amounted to no defense at all.

*Id.* at 22.

*Rivas* is distinguishable.   In *Rivas*, counsel performed virtually no investigation.   780 F.3d at 547.   The Second Circuit held that "in viewing all the circumstances at the time, no reasonable argument can be made that Rivas's defense counsel satisfied his 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"   *Id.* at 530-31 (quoting *Strickland*, 466 U.S. at 691).   Here, by contrast, trial counsel did investigate his options.   He obtained Mr. Martinez's medical records, ECF No. 5-3 at 10-11, and consulted with Dr. Stewart "regarding whether it would be worthwhile to utilize a forensic psychiatrist in [Mr. Martinez's] defense," *id.* at 11.  After having "significant," *id.*, conversations with Dr. Stewart, and considering the other evidence in the case, *id.* at 12, trial counsel "made the decision not to use an expert psychiatrist or put forth a diminished-capacity defense at trial," *id.*  "Rather, he would use Dr. Stewart's opinion for mitigation at sentencing."   *Id. Strickland* instructs that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."   466 U.S. at 690; *see also Knowles v. Mirzayance*, 556

U.S. 111, 124 (2009) (same). Indeed, as the post-conviction stated, that "[t]he decision whether to call a witness or not is a tactical one." ECF No. 5-3 at 25; *see Lally v. Murphy*, Civil No. 17-10834-LTS, 2018 WL 3518498, at *14 (D. Mass. July 19, 2018) ("The selection of witnesses is a quintessential strategic call reserved for defense counsel, who is uniquely steeped in the particulars of the case and the myriad competing considerations impacting such a choice."). The post-conviction court's finding that trial counsel's "tactical decision in this regard was reasonable 'in view of the totality of the circumstances.'" ECF No. 5-3 at 25 (quoting *Hazard v. State*, 968 A.2d 886, 893 (R.I. 2009)), was not an unreasonable application of *Strickland, see Flores-Rivera v. United States*, 16 F.4th 963, 969 (1st Cir. 2021) ("This court considers a wide range of actions to be reasonable strategy. A decision by counsel that 'prove[s] unsuccessful, or even unwise,' may nevertheless be a reasonable strategic choice." (quoting *United States v. Natanel*, 938 F.2d 302, 310 (1st Cir. 1991))) (alteration in original).

Further, as the state court noted, the RISC "has already encountered a similar fact pattern in reviewing an ineffective assistance of counsel claim." ECF No. 5-3 at 26 (citing *Page v. State*, 995 A.2d 934 (R.I. 2010)).

> In *Page*, the applicant for postconviction relief was sentenced to life imprisonment without the possibility of parole for what the trial justice referred to as "the most atrocious, barbaric killing imaginable." The applicant's trial counsel had initially considered employing a diminished-capacity defense, but based upon a psychiatrist's damning evaluation, the trial counsel did not present any psychiatric or psychological testimony at trial because he believed that such testimony "could not help [his] client." Given the "formidable evidence of guilt"—in the form of the applicant's incriminating statements and the gruesome photographs of the victim's "brutally beaten body"—the trial

counsel believed that "the best strategy would be *to focus on sentencing*."
It was the trial counsel's hope that "the trial justice would manifest some
degree of leniency towards [the applicant] at sentencing." Following the
postconviction relief hearing, the hearing justice rejected the applicant's
claim of ineffective assistance of his trial counsel because the "trial
counsel had faced overwhelming physical evidence and had been left
with no realistic trial strategy." The hearing justice was satisfied that
trial counsel had conducted a reasonable investigation into the possible
defense of diminished capacity before deciding against it due to the
psychiatrist's assessment.  In reviewing the hearing justice's decision,
the Supreme Court found no error in the determination that trial
counsel's choice not to present a diminished-capacity defense was "an
appropriate strategic decision." The Court was thus "unable to conclude
that the post-conviction relief hearing justice erred in holding that
counsel's performance was reasonable and, as such, did not run afoul of
even the first prong (deficiency) under the *Strickland* test."

*Id.* at 26-27 (alterations in original) (internal citations omitted).  The RISC opined:

After a careful review of the record, we perceive no basis for holding that
the hearing justice erred in ruling that Mr. Page was not deprived of the
effective assistance of counsel at his trial.  We are in agreement with the
hearing justice's ruling that Mr. Page's counsel acted well within the
level of competence that is expected of trial attorneys representing
criminal defendants.

Our review of the record convinces us that the hearing justice did not
err in finding that Mr. Page's trial counsel sufficiently investigated the
defense of insanity or diminished capacity.  Counsel made the strategic
decision not to employ such a defense after consulting with the
psychiatrist who had examined his client and learning that the
psychiatrist's observations regarding Mr. Page appeared more
damaging than helpful.  The hearing justice found counsel's choice to be
an appropriate strategic decision, and we perceive no error . . . in that
finding.

*Page*, 995 A.2d at 944.

Comparing Mr. Martinez's case to *Page*, the post-conviction court here stated:

In this case, [trial counsel] made a nearly identical strategic decision.
Unlike the psychiatrist in *Page*, Dr. Stewart indeed provided what was
potentially a helpful opinion regarding Petitioner's lack of intent due to
diminished capacity.   Nevertheless, [trial counsel] was faced with

equally damaging evidence against Petitioner: Petitioner had made incriminating statements, and the crime scene and photographs were so disturbing that [trial counsel] believed the case would be over as soon as they were shown to the jury. In *Page*, as a result of the "horrendous" evidence, the trial counsel's "ultimate goal" was obtaining leniency for the applicant at sentencing; [trial counsel's] objective in this case was the same. And this Court, as did the hearing justice in *Page*, finds that employing Dr. Stewart's testimony at sentencing was "an appropriate strategic decision."

ECF No. 5-3 at 27 (internal citations omitted).

Mr. Martinez questions the post-conviction court's reliance on *Page*. ECF No. 11 at 29 n.12. He argues that "[i]n *Page*, it was objectively reasonable for trial counsel to forego a diminished capacity defense because the expert did not support that defense. In fact, the expert's testimony would have doomed the defense. The opposite was the case here. The expert testimony clearly supported the only viable defense." *Id.*

*Page*, however, is not as "inapt," ECF No. 11 at 29 n.12, as Mr. Martinez suggests. In *Page*, defense counsel considered either an insanity or diminished-capacity defense. 995 A.2d at 944. However, the psychiatrist with whom he had consulted and who had evaluated the defendant told counsel that the defendant was "one of the most dangerous individuals [he] had ever met." *Id.* at 938. Therefore, counsel determined not to present the psychiatrist's testimony (or that of any other psychiatrist or psychologist) at trial because "he believed that such testimony 'could not help [his] client.'" *Id.* (alteration in original). The difference in Mr. Martinez's case, as he points out, is that Dr. Stewart's opinion supported a diminished-capacity defense. ECF No. 11 at 29 n.12; *see also* ECF No. 5-3 at 24 ("In my opinion,

[Petitioner] cannot be considered fully blameworthy and legal mitigation may be worth consideration in this case." (quoting Dr. Stewart's report)) (alteration in original). But, not unlike defense counsel in *Page*, the post-conviction court found that trial counsel was faced with the possibility of harmful evidence coming in were a diminished-capacity defense to be used. ECF No. 5-3 at 12. Further, counsel faced "overwhelming physical evidence," *Page*, 995 A.2d at 940; *see also* ECF No. 5-3 at 27 (noting "equally damning evidence" against Mr. Martinez), of a "brutal killing," *Page*, 995 A.2d at 937; *see also* ECF No. 5-3 at 1 (describing the "appalling, brutal murder" of the victim), including "gruesome photographs," *Page*, 995 A.2d at 939; *see also* ECF No. 5-3 at 9 (noting trial counsel's testimony regarding the "graphic photographs"). In both cases, counsel determined that "the best strategy would be *to focus on sentencing.*" *Page*, 995 A.2d at 939; *see also* ECF No. 5-3 at 24-25 (describing trial counsel's "strategic decision" to use Dr. Stewart's opinion as mitigation during sentencing). Both cases involved ineffective assistance of counsel claims based on claims that counsel "fail[ed] to conduct an investigation into possible defenses and fail[ed] to present any defense at trial . . . ." *Page*, 995 A.2d at 944; *see also* ECF No. 5-3 at 3 (noting Mr. Martinez's allegation that trial counsel "failed to secure experts to testify . . . at trial"); *id.* at 4 (noting Mr. Martinez's claim that trial counsel "did not put forth a defense for the jury to consider"). And both courts found that

counsel made strategic choices that were not unreasonable. *See Page*, 995 A.2d at 944; ECF No. 5-3 at 27, 28-29.[14]

In addition to the R.I. Supreme Court, the First Circuit has provided guidance as well. In *Hensley*, the court was faced with a similar ineffective assistance of counsel claim. There, the petitioner was convicted of first-degree murder, under theories of deliberate premeditation and extreme atrocity or cruelty. 755 F.3d at 726, 728. He faulted defense counsel for failing to present a forensic psychiatry expert, Dr. Rosmarin, whom he had retained as a witness, as well as failing to introduce into evidence medical records pertinent to the Petitioner's mental impairment and its effect on his capacity. *Id.* at 735. Hensley claimed that the Massachusetts Supreme Judicial Court's ("SJC") determination that counsel was not deficient resulted in both an unreasonable application of *Strickland* as well as an unreasonable determination of the facts. *Id.* at 735.[15]

---

[14] Mr. Martinez relies on a Third Circuit case, *Workman v. Superintendent Albion SCI*, 915 F.3d 928 (3d Cir. 2019), for the proposition that "any objective standard of reasonableness requires counsel to understand facts and testimony and adapt to them, even at the expense of their theory." ECF No. 11 at 27 (citing *Workman*, 915 F.3d at 944). However, both the post-conviction court in Mr. Martinez's case and the RISC in *Page* specifically noted that the attorneys faced "horrendous" *Page*, 995 A.2d at 940, and "damaging," ECF No. 5-3 at 27, evidence against their clients and adapted their strategies accordingly. In *Page*, counsel's "'ultimate goal' was obtaining leniency for the applicant at sentencing," 955 A.2d at 940; "[trial counsel's] objective in this case was the same," ECF No. 5-3 at 27.

[15] In *Hensley*, the defendant appealed his conviction, as well as the trial court's denial of his motion for a new trial based on an ineffective assistance of counsel claim. 755 F.3d at 729. The SJC consolidated the two appeals. *Id.*

The SJC observed that the report prepared by the forensic psychiatrist for Hensley's appeals contained some favorable findings, "namely that mental impairment and dissociative symptoms precluded Hensley from 'form[ing] the intent to kill or inflict grievous bodily harm.'" *Id.* at 730 (alteration in original).

> However, the SJC noted that the report was not all advantageous. The report also contained damaging statements about Hensley's level of criminal responsibility, as well as a gruesome description of the murder, which included references to Hensley being angry and blaming Nancy for his suicidal designs. Moreover, the SJC found it significant that this was not a case in which defense counsel had failed to investigate a mental impairment defense. Rather, counsel had thoroughly investigated (and ultimately presented) a mental impairment defense, but counsel made the strategic decision not to make Dr. Rosmarin part of that defense. Given the damaging information contained in the report, the fact that calling Dr. Rosmarin would have opened the door for the Commonwealth's expert to testify, and the ample evidence of Hensley's severe depression offered by family and friends, the SJC concluded that counsel was not ineffective for failing to present Dr. Rosmarin's expert testimony.

*Id.*

In affirming the denial of the petitioner's federal habeas petition, the First Circuit stated that "[t]he decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony." *Id.* at 737 (quoting *Horton v. Allen*, 370 F.3d 75, 86 (1st Cir. 2004)). The court continued:

> Here, in addition to keeping out some potentially nocuous testimony, trial counsel's decision not to call Dr. Rosmarin meant that the state could not present the rebuttal expert witness that it had retained. It is on Hensley to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." It is plain that he has not done so here.

*Id.* at 737 (quoting *Strickland*, 466 U.S. at 689) (internal citation omitted).  The First Circuit reached the same conclusion regarding the medical records, stating that it was possible that they "would have done more harm than good to Hensley's case." *Id.* Therefore, the court found it difficult to see how counsel's decision was "patently unreasonable." *Id.; see also id.* ("To prevail under *Strickland*, counsel's choice must have been 'so patently unreasonable that no competent attorney would have made it.'" quoting *United States v. Rodriguez*, 675 F.3d 48, 56 (1st Cir. 2012)).  In summary, the court found that "the SJC reasonably determined that defense counsel's decision not to call Dr. Rosmarin, or present the subject medical records, was sound." *Id.*  The court stated that counsel had retained the psychiatrist, obtained the records, provided them to the psychiatrist, and had him evaluate the defendant. *Id.*  Counsel then "reasonably elected" to try and establish Hensley's mental impairment through other testimony. *Id.*  Finally, counsel obtained a mental impairment instruction and argued that Hensley's impairment made "murder in the second degree the more appropriate choice." *Id.*

Here, too, the post-conviction court found that trial counsel investigated a mitigation defense.  He obtained Mr. Martinez's medical records and retained a psychiatrist, Dr. Stewart, who evaluated Mr. Martinez and prepared a report. Ultimately, trial counsel decided against having Dr. Stewart because it might open the door to damaging testimony being introduced.  Trial counsel sought to use Mr. Martinez's own words to establish a defense of no premeditation, obtained an instruction on second-degree murder, and argued lack of premeditation in closing.

The state court found that trial counsel's choice was "an appropriate strategic decision." ECF No. 5-3 at 27; *see also Watson v. United States*, 37 F.4th 22, 28 (1st Cir. 2022) ("Only when counsel's strategy was so patently unreasonable that no competent attorney would have made it may we hold such performance as deficient.") (internal quotation marks omitted); *Hensley*, 755 F.3d at 737. Given the deference that this Court must afford to state court rulings under § 2254(d)—although not unlimited—the Court cannot say that the R.I. Superior Court's decision was an unreasonable application of *Strickland*.

> Relief pursuant to 28 U.S.C. § 2254(d)(1) is not called for when this court might merely have a different opinion as to how things should have turned out. To the contrary, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate it is outside the universe of plausible, credible options. This is a high hurdle . . . .

*Hensley*, 755 F.3d at 737 (internal citation and quotation marks omitted). Mr. Martinez has not surmounted that hurdle. *See id.*; *see also Lucien v. Spencer*, 871 F.3d 117, 131 (1st Cir. 2017) ("Even if we were to view such a choice as negligent, that would not be nearly enough: Our review of ineffective assistance claims like this one is 'doubly deferential,' requiring Lucien to show that counsel's performance was objectively unreasonable <u>and</u> that no reasonable jurist would come to the contrary conclusion the state court drew.").

Mr. Martinez also argues that the post-conviction court's decision was based on an "unreasonable determination of the facts in light of the evidence presented at the state court post-conviction hearing." ECF No. 11 at 3. According to Mr. Martinez,

"[t]he state court found that trial counsel pursued a defense of no-premeditation and that was objectively unreasonable. This was an unreasonable decision by the state court because a defense of no premeditation, in this case, was legally and factual[ly] invalid." *Id.* at 22.

Mr. Martinez focuses on the "overwhelming evidence of premeditation . . .," *id.* at 24, as evidenced by the struggle between Mr. Martinez and the victim, *see id.* "A struggle is evidence of premeditation." *Id.* (citing cases). Thus, Mr. Martinez concludes, "[w]hile trial counsel argued Mr. Martinez did not possess the intent to kill for more than a mere moment, he simply did not have the record to support it." *Id.* at 25; *see also id.* at 26 ("[H]ere, trial counsel 'acted as an advocate not of his client but of his theory' despite that theory conflicting with the facts and testimony before the jury." (quoting *Workman,* 915 F.3d at 943-44)). The problem with Mr. Martinez's argument is that he questions trial counsel's interpretation of the facts, which is not the same as the post-conviction court's. *See id.* at 21 ("With these facts, any competent counsel would have asserted a diminished capacity defense."); *see also Harrington,* 562 U.S. at 101. He has not challenged any specific factual findings made by the state court. *Compare* ECF No. 5-3 at 8-18 *with* ECF No. 11 at 18-21, 224-25; *see also Hensley,* 755 F.3d at 735-36 ("The problem is that although Hensley frames this as a fact-based habeas challenge, a review of his brief reveals that he does not dispute the accuracy of any of the [court's] factual determinations. Rather, Hensley quibbles with the emphasis the court put on certain facts or the context in which the court placed the facts. . . . In other words, Hensley does not even allege

that the court's factual findings were erroneous, let alone furnish us with evidentiary support to overcome the fundamental principle of deference to state court findings that § 2254(d)(2) calls for.") (internal quotation marks omitted).

Mr. Martinez also challenges the state court's reliance on trial counsel's "post-hoc explanation for not presenting a diminished capacity defense . . . ." ECF No. 11 at 17; *see also id.* at 28 ("The reasons trial counsel provided for foregoing a diminished capacity defense are of no moment because the defense he pursued was unreasonable as it was factually and legally invalid. Nothing he said at the post-conviction hearing can dispel that. The state court relied on these reasons in denying Mr. Martinez relief. It was unreasonable for the state court to do so.") (internal footnote omitted); *id.* at 17 ("It was unreasonable for the state court to rely on trial counsel's explanations to deny Mr. Martinez relief.").[16]

The Court is not convinced that the post-conviction court simply relied on trial counsel's "post-hoc explanation . . . ." ECF No. 11 at 17. Trial counsel did not testify at the post-conviction hearing in a vacuum. Hearing counsel questioned him at length. ECF No. 12-1 at 1221-62. The post-conviction court also heard testimony from both Ms. Sheehan and Dr. Parsons. *Id.* at 1292-99, 1303-40. The parties submitted multiple exhibits, *id.* at 1218-19, and the post-conviction court offered the parties the opportunity to submit post-hearing memorandums, *id.* at 1408. And, in addition to the post-conviction proceedings, the post-conviction justice "read and

---

[16] The Court notes the State's observation that "[i]t is unclear how the testimony of a trial attorney at any post-conviction ineffective assistance of counsel hearing could ever be anything other than 'after-the-fact.'" ECF No. 14 at 2 n.2.

analyzed the trial transcript."  ECF No. 5-3 at 22 n.12 ; *see also id.* ("In determining whether trial counsel's performance was effective, no evidence is more probative than the trial transcript, for through the transcript a trial justice hearing [an application] for postconviction relief can observe, albeit second-hand, what actually happened as far as the trial counsel's actions are concerned." (quoting *State v. D'Alo*, 477 A.2d 89, 91 (R.I. 1984)) (alteration in original).

Here, Mr. Martinez has not overcome the fundamental principle of deference to state court findings that § 2254(d)(2) calls for."  *Hensley*, 755 F.3d at 736; *see also Shuman v. Spencer*, 636 F.3d 24, (1st Cir. 2011) ("Nor do we find any basis to conclude that the SJC's ineffective assistance of counsel analysis was based on an unreasonable determination of the facts in light of the evidence presented at trial. . . . Shuman has not succeeded in rebutting these presumptively correct findings."). As noted above, "[t]his demanding showing cannot be made when [r]easonable minds reviewing the record might disagree about the finding[s] in question."  *Porter*, 35 F.4th at 75  (second alteration in original) (internal quotation marks omitted).

The Court has carefully reviewed the post-conviction hearing transcript and the post-conviction court's factual findings.  Viewing the state court's factual findings with deference, *see Teti*, 507 F.3d at 58, the Court cannot find that the state court unreasonably determined the facts  in light of the evidence before it, *see* 28 U.S.C. § 2254(d)(2).  Therefore, the Court concludes that the post-conviction court's decision was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In addition to challenging the factual validity of trial counsel's strategy, Mr. Martinez also contends that the defense of no premeditation was legally invalid. *See* ECF No. 11 at 2; *id.* at 22. Mr. Martinez argues that:

> Trial counsel was supposed to know the elements of first-degree murder, second-degree murder, and voluntary manslaughter. The elements of the crime are the starting point for legal research and dictate what defenses are available. Further, in a diminished capacity case, to understand the value of an expert's testimony, an attorney must understand the law of murder. Here, trial counsel was either confused about the law, or just ignorant of it, which triggered his unreasonable selection of a defense and failed to provide Mr. Martinez with professionally competent assistance.

ECF No. 11 at 22-23 (footnotes omitted). Apparently, Mr. Martinez's argument is based on trial counsel's use of the terms "heat of passion" and "crime of passion" during the trial and post-conviction hearing:

> Trial counsel alternatively characterized his defense as a "heat-of-passion" defense and that his goal was to get second-degree murder. So the best defense was real heat of passion and the jealous guy and it was instantaneous without premeditation and therefore it's second degree. This is illogical. First, "heat of passion" and second-degree murder are two different things in Rhode Island law. Second, it is clear that trial counsel was not pursuing a heat-of-passion defense because he never requested the appropriate jury instruction.
>
> Trial counsel also called this defense a "crime of passion" defense, which is not a defense recognized under Rhode Island law.

*Id.* at 23 n.9 (internal citations omitted).

The State counters:

> [W]hen viewed in context, it is apparent that the terms involving "passion" were used more as adjectives based upon the love triangle motivation and not as actual legal theories of defense and it is clear that trial counsel knew the difference. The trial attorney mentioned a lack of premeditation and second-degree murder repeatedly during the [post-conviction] hearing.

ECF No. 14 at 4.  Further, the State argues, "[d]espite his claims that references to the term 'passion' demonstrate confusion or ignorance, even defendant recognizes that a 'heat of passion' defense was not pursued as a legal theory, since such a jury instruction was never requested."  *Id.* at 5.   In fact, the trial justice gave an instruction on second-degree murder, ECF No. 5-3 at 22, which, under Rhode Island law, is only given when warranted, *see Parkhurst*, 706 A.2d at 423 ("It is well-settled that instructions should not be given on lesser degrees of murder or manslaughter unless there is evidence in the case to support such a finding.") (internal quotation marks omitted).

After   summarizing the law of murder in Rhode Island, the post-conviction court stated:

> At Petitioner's trial, the State theorized that Petitioner intended to kill Ms. Burke, and the duration of the intent to kill was questionable;  the trial justice thus instructed the jury on both first- and second-degree murder.  Given that Petitioner unquestionably committed the murder, [trial counsel's] ultimate goal was a second-degree murder conviction, requiring the jury to find that the formation of the intent to kill [was] merely momentary.  To that end, [trial counsel's] theory of defense was that Petitioner "snapped" when he learned that Ms. Burke had a new man in her life—he could not handle feeling "f***ed over" yet again.  Petitioner's videotaped confession contained his statement that "rage filled me in a split second." [Trial counsel] tried to show the jury that the State had not proven that the murder was premeditated.  He cross-examined the State's witnesses to that effect.   Furthermore, [trial counsel] dedicated his closing argument to painting the evidence in that light, even conceding murder in the second degree.  The jury, however, disagreed, convicting Petitioner of first-degree murder.

ECF 5-3 at 22 (second and fourth alterations in original) (internal citations omitted). The post-conviction court was clear on trial counsel's understanding of the law, and

"it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Carpio*, 269 F. Supp. 3d at 7 (same).

The Court recognizes that the deference owed to state court findings, although considerable, is not unlimited. *See Porter*, 35 F.4th at 75 ("[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."). Mr. Martinez may be correct that, in hindsight, a limited capacity defense would have been a better option. ECF No. 11 at 17 ("The only viable defense here was diminished capacity, which trial counsel failed to present."). However, the Supreme Court has admonished reviewing courts to avoid hindsight and, instead, reconstruct the circumstances and evaluate counsel's performance from counsel's perspective at the time. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Accordingly, the Court is constrained to find that fairminded jurists could disagree on the correctness of the state court's application of *Strickland*. *See Harrington*, 562 U.S. at 101; *see also Norton*, 351 F.3d at 8 ("If it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." (quoting *McCambridge*, 303 F.3d at 36)); *Martin v. Merrill*, Civil No. 07-156-B-W, 2008 WL 114569, at *1 (D. Me. Jan. 9, 2008) (same).

## CONCLUSION

Accordingly (or based on the foregoing), the Court GRANTS the State's Motion to Dismiss (ECF No. 5) and DISMISSES Mr. Martinez's Petition (ECF No. 1).

## RULING ON CERTIFICATE OF APPEALABILITY

Under Rule 11(a) of the Rules Governing § 2255 Proceedings in the United States District Courts ("§ 2255 Rules"), this Court finds that this case is appropriate for issuing a certificate of appealability, because Mr. Martinez has made a substantial showing of the denial of a constitutional right on any claim, as required by 28 U.S.C. § 2253(c)(2).

Mr. Martinez is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal here. *See* § 2255 Rule 11(a).

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Chief Judge

December 13, 2022